## Marion Chapman *v.* W. Woodward, Tutor, et al.

Where the extra-judicial declarations of a party were offered in evidence against him, and it appeared that they were not necessarily called for when made, that they were in some instances made when in an inebriated condition and always boastfully—*Held :* that if admissive at all in a suit relating to his succession, they should be entitled to no weight whatever, unless strongly fortified by other and independent corroborating evidence.

Where a man, married for the second time, purchases property belonging to the community which existed between himself and first wife at a sale to effect a partition between himself and the heirs of his wife—such property, unless he explain himself differently at the time of the purchase, will fall into the community then existing between himself and second wife.

The neat proceeds of a crop growing, but ungathered at the time of the death of one of the spouses, belongs to the community.

The heirs of a deceased spouse are entitled to receive one-half of the fruits and revenues of the community property from the survivor, when such survivor is not entitled to the usufruct.

The charge for such fruits and revenues accruing before a second marriage is against the separate estate of the survivor ; but that accruing after a second marriage is against the community arising from such second marriage.

In actions of partition involving a settlement of claims or accounts, no prescription is applicable except that which is a bar to the partition itself.

APPEAL from the District Court of the Parish of East Feliciana, *Ratliff*, J. John & Charles McVea, for plaintiff. *J. B. & J. J. Smith*, for defendants and appellants.

Duffel, J. *Thomas Chapman, Sr.*, the ancestor of the parties to this suit, died on the 9th of January, 1859. He was twice married. The defendants are the descendants of his first marriage with *Nancy Anderson*, who died in 1827, and

the plaintiff is the only issue of his second marriage with *Mathilda Caroline Rouck* who died on the 14th of May, 1854.

The present litigation relates principally to the settlement of the community which existed between *Thomas Chapman, Sr.,* and his second wife.

I. The plaintiff charges: that at the death of his mother, his father had $15,000 for which he failed to account, and which should be credited to the community.

II. That the following property, to wit, the slaves *Terriby* and *Melinda*, and two tracts of land, the "Home place" and the adjoining one, also form part of said community, and are not the separate property of *Thomas Chapman, Sr.*

III. That the crop of 1854 also forms part of the community.

*First point.* In order to establish the claim of $15,000, the plaintiff introduced in evidence the proces-verbal of the inventory made after the death of *Thomas Chapman, Sr.,* showing, in ready money, promissory notes, and a judgment against *Powers,* $17,575 90, and produced five witnesses who swore to the extra-judicial declarations of *Thomas Chapman, Sr.,* made at various times, before and after the demise of his wife and out of the presence of the parties in interest, from which it would appear that he had from $8,000 to $15,000. The District Judge, on this evidence, awarded $12,500.

Those declarations were not necessarily called for—were, in some instances, made when in an inebriated state, always boastingly, and consequently, if admissible at all in a matter of this kind, should be entitled to no weight whatever, unless strongly fortified by other and independent corroborating evidence. Hennen's Dig. vol. 1, p. 503, No. 7.

We do not deem it necessary to express any opinion, as to the admissibility of those extra-judicial declarations in evidence, as by giving them effect, they stand alone and uncorroborated, and we may add, disproved; for the defendants, in order to rebut those loose declarations, introduced proof, oral and written, showing that in 1849 and 1850, *Thomas Chapman, Sr.,* was in embarrassed circumstances, and borrowed from *Oakey & Hawkins* $1,000; that suits were instituted against him for debts as surety; that from 1850 to 1854 he paid, without being sued, $2,345, as surety of his pre-deceased son, *Thomas Chapman, Jr.;* that he bought slaves at the succession sale of *Saunders* and paid for them, and that, shortly after the death of his wife, he denied, in the most emphatic language, that he had any money.

The deceased was present at the taking of the inventory made shortly after the demise of his wife, and yet did not acknowledge any cash and promissory notes, as it was his duty to do, did any notes exist.

Now, by taking the neat proceeds of the crop of 1854, $4,574 66, in the absence of any other evidence, as the basis of the crops of 1855, 1856 and 1857, we have for the four years $19,306 66, from which deduct the debts of the community paid after the death of *Mathilda Chapman,* say $3,012 50, we have a balance of $16,294 16, or $1,281 74 less than the amount represented in cash, promissory notes and the judgment against *Powers.* This excess of $1,281 74 may be very readily accounted for, if we compute the interests which must have been realized on the money lent; and we may, beside, fairly infer that a part of the crop of 1858 had been sold before the death of *Thomas Chapman, Sr.*

We are, therefore, of opinion that the plaintiff has failed to make out this branch of the case.

*On the second point.* The evidence shows that the slave *Melinda* was the prop-

erty of *John Chapman*, the brother of *Thomas*, and that the title of the latter was acquired by inheritance. Our judgment, in this respect, will be an affirmance of the decree of the District Judge.

The evidence also shows that the *Bostwick* tract forms a part of the community of the second marriage, and the defendants do not in fact contest the point.

It, however, appears that the slave *Terriby* and the *Homestead tract* belonged, originally, to the community which existed between *Thomas Chapman, Sr.*, and his first wife, and were adjudicated to the former on the 9th of January, 1847, during the existence of the second community, for $3,400, in order to effect a partition between said *Chapman* and his children, at his own suit. The question which suggests itself is, do the above land and slave belong to the second community, for the whole, for the undivided half, or remain the separate property of *Thomas Chapman, Sr.* Tested by the article 2371 of the Civil Code, the entire *property* would fall into the community.

There is, between the husband and the wife, so to speak, *a moral being*, having distinct interests from those of the spouses respectively; this fictitious being is the community created by law, and having the husband as its recognized head or mandatory. C. C. 2369, 2373; Duranton on Mar. Cont. vol. 14, No. 96; Marcadé on Mar. Cont. vol. 5, art. 1403, par. 1.

The French Code, Art. 883, says : " Each co-heir is presumed to have succeeded alone and immediately, to all the effects comprised in his lot, or to him adjudicated on a licitation, and never to have had the ownership of the other effects of the succession." And Duranton, vol. 7, No. 513, tit. Succ., p. 709, commenting on this article, remarks : " Une importante dérogation apportée par notre jurisprudence française à la législation romaine, et que le code a consacrée, c'est que, chez nous, le partage est simplement *déclaratif* du droit de propriété dans la main de chaque copartageant, quant à la totalité des objets tombés à son lot, tandis que, chez les Romains, il opérait un échange ; il était par conséquent *translatif* de la propriété, réciproquement."

The Code Napoleon, Art. 1408, provides specially that an acquisition made during the marriage, by cant or otherwise, of a portion of an immovable of which one of the spouses held an undivided interest, does not form an acquest. And it is because of this article that the undivided interest acquired during the marriage is excluded from the community. " En effet l'attribution de la qualité de propre à un immeuble acquis pendant le mariage est, en définitif, une exception au principe général de l'article 1401, no. 3. Si c'est une exception, elle ne peut donc être admise que par l'effet d'une disposition formelle, ou d'une cause qui l'entraîne forcément après elle." Marcadé, Cont. Mar., art. 1408, vol. 5, p. 477, sec. vii.

Our present Civil Code contains no such provisions, although the Code of 1808, p. 207, art. 249, considers the heir to have been seized of the property allotted to him from the opening of the succession.

The Civil Code, Art. 1420, provides : " Partition is a sort of exchange, which the co-heirs make among themselves, one giving up his right in the thing which he abandons, for the right of the other in the thing he takes ;" thus adopting, with regard at least to partitions in kind, the Roman laws. Domat, Civil Law, Book 1 of Succ., tit. 4, sec. I, par. II.

In a partition in kind, the spouse who is an heir, appears as an heir, and shares as such ; but in a partition by cant or licitation, it is not necessarily the case ; the heir, unless he explains himself, bids as any other person ; and it is that *moral being* who is presumed to bid, and to buy the property which was in common be-

tween one of the individual partners of the community and other persons; and thus the whole property becomes an *acquest* of the community. It was, by implication, so held in the case of *Haché* v. *Ayraud,* 14 An. 178, and more recently in the District of Opelousas, in a case to the point, reported in 15 An. 588, *Azélie Breaux, widow, et al.,* v. *Emilien Carmouche.* We are not disposed to disturb those decisions, which will greatly facilitate and simplify the settlement of estates hereafter, without doing violence to any provisions of the Code.

*On the third point.* The net proceeds of the crop of 1854, which, from the evidence, we are satisfied amounted to $4,574 66, forms part of the community. C. C. 2376; *Harrell* v. *Harrell,* 12 An. 549.

The defendants in their answer reconvene and claim as heirs of their mother, from the community estate of their father and second wife, hire for the slave *Terriby* and for the *Homestead* tract, from 1st January, 1826, to 1st January, 1854. This slave and this tract of land were, as before stated, property of the first community; and the legal right of the heirs of the deceased spouse, to recover one-half of the fruits and revenues of the community property, from the survivor, when not entitled to the usufruct, is well settled. *Petrie* v. *Wofford,* 3 An. 562; *Broussard* v. *Bernard,* 7 L. 217; *Griffin* v. *Waters,* 1 R. 149; *Stewart* v. *Pickard,* 10 R. 18. So far as this claim accrued before the second marriage, it is a charge upon the separate estate of the father; and so far as it accrued after the second marriage, it is properly a charge upon the community. And as the second marriage was contracted in 1829, and dissolved on the 14th of May, 1854, the claim, as a community debt, must be computed from the date of the marriage, say 1st January, 1830, to the date of the probate sale, say 9th January, 1847.

The evidence shows that the services of the slave *Terriby* were worth at the rate of $75 per annum, and that the use of the land was worth the yearly rent of $120: thus making in the whole, for seventeen years, a grand total of $3,315, for one-half of which, say $1,657 50, the second community is liable to the children of the first marriage.

The plea of prescription of one, two, three, five and ten years, opposed by the plaintiff, does not bar the demand; because in actions of partition involving a settlement of claims, or accounts, no prescription is applicable, except that which is a bar to the partition itself. *Widow and Heirs of King* v. *Wartelle,* 14 An. 740. The defendants also claim hire for the slave *Melinda,* but they, as heirs of their mother, had no title to this slave, and it does not satisfactorily appear that they had any, prior to the death of their father.

It is, therefore, ordered, adjudged and decreed, that the judgment of the lower Court be avoided and reversed; and it is now ordered, adjudged and decreed, that the claim of the plaintiff for fifteen thousand dollars be rejected, as also his claim to the slave *Melinda* as community property.

It is further ordered, adjudged and decreed, that the slave *Terriby,* the "*Homestead tract*" and the *Bostwick tract,* be declared community property of the second marriage of *Thomas Chapman, Sr.,* and *Mathilda C. Rouck.*

It is further ordered, adjudged and decreed, that the estate of *Thomas Chapman, Sr.,* account in partition to the estate of his wife, *Mathilda Caroline Rouck,* for one-half of the neat proceeds of the crop of 1854, which half amounts to two thousand two hundred and eighty-seven dollars and thirty-three cents ($2,287 33).

It is further ordered, adjudged and decreed, that the estate of *Thomas Chapman, Sr.,* take, in the partition, from the community between said *Chapman* and *Mathilda C. Rouck,* the sum of seventeen hundred dollars, being the one-half of the

price of the slave *Terriby* and of the "*Homestead tract*" accruing to the said *Thomas Chapman*, as per the proces-verbal of the sale of the 9th January, 1847, made to effect a partition with the children of the first marriage.

It is further ordered, adjudged and decreed, that the community estate of *Thomas Chapman, Sr.*, and *Mathilda C. Rouck*, account and pay in partition, to the defendants, the sum of sixteen hundred and fifty-seven dollars and fifty cents ($1,657 50), being the one-half of the hire and rent of the slave *Terriby* and the *Homestead tract*, from January 1st, 1830, to January 9th, 1847.

And as the District Judge allowed the following debts of the community between *Thomas Chapman, Sr.*, and *Mathilda C. Rouck*, paid by the former after the death of his wife, (the same not being contested in this Court,) to wit, $2,433 paid as one of the sureties of *John W. Hays ;* $279 paid *P. Pond, Jr. ;* also $300 to be paid to *J. B. Smith ;* also $300 paid to *W. D. Winter*, making in all $3,312 : It is, therefore, ordered, adjudged and decreed, that the estate of *Mathilda C. Rouck* pay in partition, to the estate of *Thomas Chapman, Sr.*, the sum of sixteen hundred and fifty-six dollars, being the one-half of the above enumerated items.

It is further ordered and decreed, that the three children of *Mary Chapman* and *William Woodward*, now both deceased, viz., *Elizabeth Woodward*, wife of *J. P. Monnahagan*, and the said *Monnahagan*, as dative tutor of the minors *Susan Ann Woodward* and *William T. Woodward*, account together for the sum of sixty-eight dollars in the partition of the estate of *Thomas Chapman, Sr.*, this amount being an excess over the portion coming to them in the estate of *Nancy Anderson.*

And it appearing, further, that the slave *Melinda* has been sold by consent, and the proceeds divided by the judgment of the lower Court, which, in this respect, is not complained of in this Court : It is, therefore, further ordered and decreed, that the proceeds of the sale of said slave *Melinda* be divided among the parties to this suit as follows, to wit, to *Thomas Brashier*, three hundred and fifty-six dollars and twenty-five cents ; a like amount to be divided equally between the above named three children of *Mary Chapman*, deceased, wife of the late *William Woodward;* and to *Marion Chapman* one hundred and eighty-seven dollars and fifty cents.

And it is further ordered and decreed, that the notary to whom the parties have been referred to make a partition of the estates of *Thomas Chapman, Sr.*, and *Mathilda Caroline Rouck*, proceed therein, in accordance with this judgment, as to the rights of the heirs herein settled, and that the plaintiff and appellee pay the costs of the appeal.

MERRICK, C. J.    On the facts of the case, from a personal knowledge of the witnesses, I concur in the conclusions of the District Judge.

On the questions of law I concur in the opinion read.

LAND, J., took no part in the decision of this case.